**Jaburg & Wilk, P.C.**
3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012
602.248.1000

Kraig J. Marton (003816)
kjm@jaburgwilk.com
David Farren (007384)
dnf@jaburgwilk.com
Jeffrey A. Silence (029143)
jxs@jaburgwilk.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cody Lundin, an individual | Case No. 2:16-cv-01568 |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | |
| Discovery Communications, Inc. a Maryland corporation; Original Media, a New York LLC; and Brian Nashel, an individual, | |
| Defendants. | |

Pursuant to this Court's order dated January 24, 2017, Plaintiff files this **First Amended Complaint**. All additions to the original Complaint except section headings are reflected in **bold and underlined** text; all deletions are reflected in ~~strikethrough~~ text.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Cody Lundin ("Cody") is an individual who at all relevant times was a resident of Yavapai County, Arizona.

JABURG|WILK
Attorneys at Law

2.    Defendant Discovery Communications, Inc. ("Discovery"), is a Maryland Corporation with its principal place of business in Maryland that, among other things, owns and operates the "Discovery Channel."

3.    Defendant Original Media, L.L.C. ("Original Media") is a New York limited liability company with its principal place of business in New York that produces, among other things, scripted and reality television shows for the Discovery Channel, including a television show called "Dual Survival."

4.    Defendant Brian Nashel ("Nashel") is a manager, employee and/or agent of Original Media and at all material times worked for that company as the Executive Producer and Show Runner for the television show Dual Survival.

5.    Nashel was at all relevant times acting within the course and scope of his employment as a manager, employee and/or agent of Original Media, LLC.

6.    Upon information and belief, Nashel is a resident of Essex County, New Jersey.

7.    All Defendants are collectively referred to herein as "Defendants."

8.    This Court has diversity jurisdiction in this action pursuant to 28 U.S.C. §1332(a) in that: (a) the amount in controversy exceeds $75,000, exclusive of interest and costs, and (b) there is complete diversity between and among all parties.

9.    Venue is proper in this action pursuant to 28 U.S.C. §1391(b).

## BACKGROUND

**A.    Cody Lundin is an internationally recognized expert survival instructor.**

10.    Plaintiff Cody Lundin is an internationally recognized professional survival instructor with more than 27 years of hands-on teaching experience.

11.    In 1991, Cody founded and owns the Aboriginal Living Skills School ("ALSS"). ALSS is Arizona's oldest and best known professional wilderness survival,

2

primitive living skills and urban preparedness school. ALSS is also one of the oldest continuously operated self-reliance schools in the United States.

12. Cody is the Lead Instructor for ALSS. As its Lead Instructor, Cody teaches ALSS students outdoor survival, primitive living skills and urban preparedness.

13. Cody is the best-selling author of two books: *98.6 Degrees: The Art of Keeping Your Ass Alive* (2003), and *When All Hell Breaks Loose: Stuff You Need to Survive When Disaster Strikes* (2006). Both have been translated into several languages and were routinely featured in the top ten best-sellers for their genre on Amazon.

14. Cody's expertise in practical outdoor skills comes from a lifetime of personal experience, including two years spent living in a brush shelter in the woods.

15. Due to his understanding of the physics, psychology and physiology of human survival, Cody was routinely featured as the premiere consulting expert on real-world emergencies for national and international news outlets.

16. Cody has trained private, corporate and governmental agencies, thousands of students and dozens of national and international media sources in outdoor survival, primitive living skills, and urban preparedness.

17. As a result of his skills and dedication, Cody has been featured in multiple media sources, including *The Today Show, History Channel, Dateline NBC, CBS News, USA Today, The New York Times, Esquire, Playboy, Good Morning America, The Donny and Marie Show, The Weather Channel, Newsweek, CNN Newsroom, TV Guide, NPR, Fox News, Discovery Channel* and *CBC Radio One* in Canada, to name a few.

18. When not teaching for his own school, Cody is an adjunct faculty member at Yavapai College and the Ecosa Institute, where he teaches survival and sustainability curriculums that he created.

18639-18639-00001\JXS\JXS\2395096.1

19.     Cody lives in a self-designed, self-reliant, passive solar earth home in the high-desert wilderness of Northern Arizona; he catches and recycles rain, composts and wastes and pays nothing for heating and cooling.

**B.     Discovery hires Cody to co-host Dual Survival.**

20.     In July 2009, Cody was hand-picked by former Discovery CEO, John Ford, to co-host a new Discovery Channel show called "Dual Survival."

21.     On or around September 24, 2009, Discovery, through its related company, Discovery Talent Services, L.L.C. ("Discovery Talent"), entered into a written Talent Agreement with Cody (the "Agreement") that sets forth the terms of Discovery's offer to him to co-host Dual Survival.

22.     The Agreement was fully executed by both parties on January 11, 2010.

23.     The Agreement states that Cody would be the "On-Camera Host, Wilderness Survival Expert, Consultant and Personality" for Dual Survival, which was scheduled to debut on the Discovery Channel.

24.     The Agreement states that it was to remain in effect for 12 months and that Discovery Talent had the option to renew the Agreement each year.

25.     Discovery Talent also hired Dave Canterbury ("Canterbury") to co-host Season 1 of Dual Survival with Cody.

26.     All Dual Survival episodes were produced by Defendant Original Media.

**C.     Dual Survival becomes one of Discovery's most popular shows.**

27.     The first episode of Season 1 of Dual Survival aired on June 11, 2010, and the tenth and final episode of Season 1 aired on August 20, 2010.

28.     Dual Survival quickly became one of the most popular and highly viewed shows on television.

18639-18639-00001\JXS\JXS\2395096.1

29.    Discovery, through Discovery Talent, renewed the Agreement with Cody for a second, third, and a fourth season until Discovery terminated Cody midway through Season 4.

30.    The second season originally aired from April 2011 through July 2011.

31.    The third season originally aired from January 2013 through March 2013.

32.    The fourth season originally aired from April 2014 through June 2014.

33.    After the second season, Discovery did not renew its co-host agreement with Canterbury because the public discovered that he had lied about serving as a military sniper, airborne and Army Ranger as was written on Canterbury's web site biography.

34.    Instead, Discovery hired Joe Teti ("Teti") to serve as Cody's co-host for Seasons 3 and 4.

**D.    Cody repeatedly complains to Defendants about Teti's violent threats and outbursts.**

35.    During the filming of Seasons 3 and 4, Teti made several unprovoked threats of violence toward Cody, Dual Survival crew members and Discovery Channel executives, threatening them with death and bodily harm.

36.    During the filming of the Hawaii episode for Season 3 in particular, but without limitation, Teti threatened several members of the crew, threatening one crew member with a deadly weapon, a spear.

37.    In that same episode, Teti ran down a highway; the Original Media producers had to chase him down in a car and convince him to resume filming the episode.

38.    Teti told Cody during the filming of the Hawaii episode that he would have "run [him] through" with the spear Cody had seen him with.

39.     The next day, Cody at his first opportunity contacted Nashel and Discovery executive French Horwitz to alert them to Teti's violent and threatening conduct and the hostile and dangerous working environment.  Cody and others on the set reasonably feared for their lives and begged Discovery to do something about it.

40.     During this conversation, Cody stated several times his opinion that Teti was psychotic, dangerous and mentally and emotionally unstable and that he (Cody) feared for his safety and that of the Dual Survival crew members.

41.     Later in Season 3, but without limitation, Teti threw a bicycle part at and struck producer Brian O'Toole ("O'Toole").  The incident was documented in a safety report, but Defendants did nothing about it or any other similar incident alleged herein. When asked about the safety report by Cody's entertainment attorney Mike Sword, Discovery executives stated they had no such report.

42.     During the filming of Season 3, Teti called Cody to threaten him telling him, "You better not blow this for me (the show)…I think you know what is going to happen to you."

43.     To back up the threat, Teti had earlier shown Cody pictures on his laptop of people he claimed to have killed while serving in the CIA.  Teti stated he worked for the agency to cast and crew in a warming tent in California after striking Brian O'Toole with a bicycle part.

44.     During Episode 5 of Season 4, entitled "Glacial Downfall," Teti threatened to "bury" Cody on the mountain while holding up an ice axe in a threatening manner in front of approximately 12 Dual Survival crew members.

45.     Cody continued to repeatedly complain to Defendants about Teti's violent, life-threatening, repeated and unabated threats and outbursts.

46.     Rather than addressing Cody's repeated concerns about his safety and the safety of the crew, Discovery terminated Cody, based on an email from Nashel, without

1  explanation or prior notice, one week after the filming of the "Glacial Downfall"

2  episode.

3      47.    Cody was summarily and wrongfully terminated and as the lead co-host of

4  Dual Survival in the midst of, and prior to the expiration of, his renewed Agreement to

5  be lead co-host of Season 4 of Dual Survival.

6      48.    After terminating Cody, to protect its own self-interests with regard to its

7  potential liability for failing to provide a safe and secure workplace, and for the purpose

8  of manipulating public opinion in its favor and against Cody in the matter, in January

9  2014, Discovery demanded on three separate occasions that Cody make a false public

10  statement to the effect that he had quit Dual Survival to work full time as an instructor

11  at his survival school.

12      49.    Each time, Cody told Discovery that he would not lie to his fans.

13      50.    Cody's refusal to lie to his fans at Discovery's request upset Defendants

14  because they knew that he was a very popular figure on the show and that they would

15  receive significant backlash from viewers (and thus loss of viewership and income) who

16  learned that Cody was no longer on the show.

17      **E.    Cody puts Defendants on notice and warns them not to defame him or
        to portray him in a false light.**

18

19      51.    In March 2014, several press releases were issued by Defendants

20  Discovery and/or Original Media concerning new episodes of Dual Survival.

21      52.    One of the press releases, found at www.BMWTvWorld.com dated May

22  28, 2014, states,

23          The stakes are higher than ever before and as a twist of
            events unravels throughout the season, one member of Dual
            Survival will leave the show for good.

24
25          Joe and Cody take on some of the toughest environments in
            the world, and their vastly different survival styles push
            them to the breaking point" said Defendants Executive

26

JABURG|WILK
Attorneys at Law

Producer, Joshua C. Berkeley. Teamwork in the wild can mean the difference between life and death, a harsh fact that Cody and Joe come face to face with. This may be the most demanding and shocking season yet, and one of these men won't finish what he started." The season Survival kicks off on Wednesday, April 23, 2014 at 9:00 p.m. ET/PT.

53.     Attached as **<u>Exhibit 1</u>** is a true and accurate copy of this press release.

54.     The press releases, including the press release attached as Exhibit 1 to this Complaint, alerted Cody and his entertainment lawyer, Mike Sword, that Defendants were planning to put together a "recap" episode to "explain" why Cody was no longer on Dual Survival.

55.     Cody feared that Defendants would use footage from previous episodes to place him in a false light and defame him to suppress some of the backlash from Cody's fans and to make fans more receptive to Cody's replacement.

56.     Attorney Tom Kack sent a letter to Discovery's Legal Department dated April 14, 2014. Page 2 of his letter stated:

This show purports to be about survival and the statement that 'one of these men won't finish what he started' combined with the balance of the statements is a clear statement that Mr. Lundin was unable to handle survival situations. This is not only untrue, it is defamation *per se* and, also, emotional distress is allowed as compensable damages because Cody Lundin's business off camera is teaching survival skills. *Modla v. Parker,* 17 Ariz. App. 54, 495 P.2d 494 (1972); *Breeser* v. *Menta Group, Inc., NFP,* 934 F. Supp. 2d 1150 (D.Ariz. 2013J; *Boswell* v. *Phoenix Newspapers, Inc.,* 152 Ariz. 1, 730 P.2d 178 (1985); and *Boswell* v. *Phoenix Newspapers, Inc., 152* Ariz. 9, 730 P.2d 186 (1986).

. . .

Please understand that Mr. Lundin's clients literally trust him with their lives. The issue is not just expertise, it is his profession and his life, and making statements which impeach his survival skills are defamation. This includes if other or similar statements are made through the course of the coming ad campaign, or if Dual Survival episode editing will promote this view.

. . .

Any statement or implication by Discovery, Original Media or their employees or agents, that Mr. Lundin is unable to hack survival situations or unable to meet the challenge of surviving in the wilderness, is defamation per se. This is because survival training is Mr. Lundin's chosen profession, and such statements will negatively impact him.

. . .

This letter constitutes notice that Defendants and Original Media not promulgate statements or implications that Cody Lundin could not meet the challenge of surviving any of the situations scripted for this year's (season four) shows, that there be no editing or hi-lighting of shows already shot to reflect any such purported inability.

**F.     Defendants ignore Cody's clear warning not to defame him or to portray him in a false light.**

57.     As Cody had feared, Season 4, Episode 5, entitled "Journey's End to a New Beginning," was a false, misleading and purposely manipulated purported "behind the scenes" episode comprised of footage selectively cut from previous episodes.

58.     A "Journey's End to a New Beginning" ("Episode 5") was broadcast by Discovery after Cody's termination.

59.     Episode 5 originally aired on the Discovery Chanel on May 21, 2014.

60.     On or about that same date, Cody issued a public statement and complaint that Episode 5 was false and defamatory.

61.     In Episode 5, Defendants used deliberately false, misleading, manipulated and selective editing and scripted interviews with Dual Survival's producers and crew members, namely Nashel, to defame Cody and place him in a false light.

62.     At the 0:51 mark of Episode 5,[1] the Narrator states, "For the first time, the crew tells the real story behind surviving in the world's most hostile lands."  This "real

---

[1] All references to timestamps in this Complaint are from Episode 5 and are taken from viewing Episode 5 through www.Amazon.com.

18639-18639-00001\JXS\JXS\2395096.1

JABURG│WILK
Attorneys at Law

story" was anything but the real story, but rather a deliberately scripted and packaged production driven by Defendants' intent and purpose to defame Cody and place him in a false light.

63.     At the 01:18 mark of Episode 5, the Narrator likewise states, "Find out what really happened this season, but hasn't been shown until now."     Again, Defendants' portrayal of "what really happened" was anything but what really happened, but rather a deliberately scripted and packaged production driven by Defendants' intent and purpose to defame Cody and place him in a false light.

64.     The clear implication of these two statements is that Episode 5 will provide the viewer with the "real story" about what "really happened" behind the scenes, conveying the false impression that the viewers had not yet been exposed to Cody's true behavior.

65.     At the 32:10 mark of Episode 5, Cody is shown throwing matches and a spear into a pool of water while cursing.

66.     The viewer is deliberately given the false and misleading impression that Cody threw the matches and spear in the water because he was angry and upset with Teti for having asked him, on only one occasion, to throw him the matches.

67.     Actually, Cody was upset with a show producer, O'Toole, who instructed Cody to throw the matches to Teti purportedly to make it easier to edit the footage for editors in New York City.

68.     Throwing matches to someone standing in water is a serious breach of standard survival protocol and could end up getting someone killed in a real-life survival situation if the matches get wet.

69.     Cody refused to misrepresent his experience, competence, expertise and professional reputation by doing something on international TV that was so clearly against standard safety protocol and his own teachings.

10

70.     Cody became upset with O'Toole for repeatedly demanding that he violate such an obvious standard safety protocol.

71.     Cody was especially upset with O'Toole because O'Toole has no survival skills or training, and this was not the first time that O'Toole had asked Cody and others to endanger or misrepresent themselves or to do something that no professional survival instructor would ever teach or do.

72.     Defendants purposely falsely and completely manipulated the incident by editing out the conversation between Cody and O'Toole, leaving the viewer with the false and misleading impression that Cody had an unprompted emotional outburst directed solely at Teti and had become dangerously and inexplicably unhinged simply because Teti had asked him, on one occasion, to throw him the matches.

73.     At the 32:30 mark of Episode 5, Nashel falsely states in reference to this match-throwing incident, "I don't know, and nobody really knows, exactly what happened, if there was an incident that set [him] off, it definitely got a little hairy."  That comment was deliberately false and misleading in that Nashel knew exactly what had happened and that his statement and the manipulated and edited version of the incident were deliberately false, misleading, defamatory and portrayed Cody in a false light.

74.     At the 32:45 mark of Episode 5, Teti likewise is shown to state, "I don't know [expletive] know what just happened. I mean, I don't know. Is he freakin' dehydrated or just like had a complete brain fart?"

75.     Nashel and Defendants knew exactly what happened – Cody was upset with O'Toole because he had repeatedly demanded that Cody throw the matches to Teti while Teti was standing in water.

76.     By completely editing out the conversation with O'Toole, Defendants intentionally falsely portrayed Cody in Episode 5 as an incompetent, inexperienced, weak, erratic, untrustworthy, overly emotional and most likely psychologically impaired

11

1    person who was incapable of handling a purported survival situation in a professional
2    and steady manner.

3        77.    Cody was a very popular, well known and well respected co-host of Dual
4    Survival and, as the only real outdoor survival expert on the show, he was primarily
5    responsible for creating the original conceptual direction, proper context and much of its
6    ideas and content.

7        78.    Upon information and belief, Defendants deliberately portrayed Cody as
8    incompetent, inexperienced, weak, erratic, untrustworthy, overly emotional and even
9    mentally impaired in order to serve their own financial interests, so that fans of the show
10   would believe their false story that he had quit the show, rather than that he had been
11   fired from the show, and that in any event, it was his own personal failings and
12   incompetence that led to his separation from the show, and thus not blame Defendants
13   or be upset that he had left the show.

14       79.    Defendants also intended to convey the equally false impression that Teti
15   was very professional and competent because he was continuing on as co-host.

16       80.    At the 33:28 mark of Episode 5, the Narrator states: "In this never before
17   seen footage, Cody vents his frustrations unaware that a camera has accidentally been
18   left rolling."

19       81.    This "never before seen footage" portrays Cody expressing his frustration
20   at O'Toole's lack of experience and incompetence that continued to plague the
21   production and Nashel's failure to do anything about it, as they were friends.

22       82.    The viewer again is deliberately given the false impression that Cody is
23   upset with Teti for asking him to throw the matches to him.

24       83.    Nashel then falsely states that the "production was down for two days . . .
25   while the producers figured out a way to work around this [match-throwing] incident."

26

84.    Contrary to the implication of Nashel's narration, production of the show was not "down for two days" due to anything Cody said or did – the truth is that production was delayed for one day because Teti, not Cody, had repeatedly screamed at and threatened several crew members and their families, threatened producer Mark Perez with a boar hunting spear, and then was chased down by producers in vehicles as Teti ran away down a Maui highway.

85.    Defendants nevertheless completely edited out the real reason for shutting down production – Teti's emotional outbursts and threats of violence toward Cody and others – and instead showed misleading footage of Cody becoming upset with the producer.

86.    At the 34:23 mark of Episode 5, Nashel states: "By the time we got to Norway, things had reached a boiling point."

87.    The Hawaii episode in Season Three was filmed in July 2012.

88.    The Norway episode in Season 4 was filmed in November of 2013 – some 16 months later.

89.    Nashel's statement implied that the Norway episode was filmed shortly after the Hawaii episode because he wanted to convey the false impression that Cody was quickly 'falling apart.'

90.    At the 36:47 mark of Episode 5, the narrator states that "distractions from filming slowed down the shoot."  Cody is then shown looking in the water saying that he is looking for rubies, conveying the impression that Cody is absent minded and mentally unstable and is not taking his responsibilities seriously.

91.    In fact, the crew was waiting on Teti, not Cody.

92.    Defendants' attempt to falsely portray and blame Cody for production delays because he was aimlessly looking for rubies was so poorly executed that, at the 36:55 mark, the producer says: "Okay, are you ready Joe?"

13

93.     Defendants intentionally and falsely portrayed Cody as being responsible for holding up production while looking for rubies in order to further their overall goal of portraying the false image that Cody was incompetent and mentally impaired in order to serve their own financial interests.

94.     At the 37:08 mark of Episode 5, Nashel states,

> It seemed like the strain of the show was getting to Cody and we could tell he was getting kind of burnt out. He was focusing on things that had nothing to do with the show like the kind of sunglasses Joe was wearing. It was really distracting to him that Joe was wearing a certain brand of sunglasses, and Cody was really having trouble staying focused on the mission at hand.

95.     In making these statements, Nashel deliberately failed to inform viewers that Teti had been trying to market Oakley sunglasses (and other gear) on the show without approval from Defendants since the beginning of Season 4 and that Cody had been upset because he felt it was unfair and unprofessional for Teti to make money from endorsement deals when he (Cody) was respecting his contractual obligations not to advertise products on the show without network approval.  Teti stated to Cody that the network had told him not to endorse gear without their approval when he began as co-host.  Teti also tried to convince Cody to endorse gear behind the network's back, and Cody refused.

96.     Nashel instead intentionally made it appear as if Cody had no valid reason for worrying about what sunglasses Teti was wearing, again portraying the false image that Cody was mentally unstable, incompetent and mentally impaired to serve Defendants' own financial interests.

97.     At the 39:00 mark of Episode 5, Cody is shown saying "F**k you Joe." This statement was never said by Cody at that time or in that context, but was deliberately dubbed in by Defendants.

14

98.     Defendants' intentional and false portrayal of Cody saying here "Fuck you Joe" was a clear attempt to further their goal of portraying the false image that Cody was incompetent, inexperienced, weak, erratic, untrustworthy, overly emotional and mentally impaired in order to serve their own financial interests.

99.     At the 39:18 mark of Episode 5, text is displayed falsely stating that Cody "declined our request to comment on the following incident from Norway."

100.    In truth, Cody was never asked to comment on any "incident from Norway."

101.    Defendants' intentional and false portrayal that Cody had been asked to comment, but declined to do so, was made in order to further their goal of portraying the false image that Cody was incompetent, inexperienced, weak, erratic, untrustworthy, overly emotional and mentally impaired in order to serve their own financial interests.

102.    At the 39:45 mark of Episode 5, Cody is shown saying "[f**k] you Nashel."

103.    By way of editing, Nashel then immediately says: "Those are the kinds of things we had to look at and take into account and say how do we continue with this relationship that clearly isn't working anymore?" The narrator then states that "Norway would be Cody's last episode of Dual Survival."

104.    The clear implication of these statements was that Cody was out of control and that he had to be removed from the show.

105.    At the same time, Defendants deliberately failed to show any of the audio or video of Teti making multiple death threats to Cody and others during the Norway and Hawaii episodes, among others.

106.    Defendants deliberately cut scenes of Teti in the Norway episode waiving his ice axe at Cody and screaming at him that he will "bury him on the mountain."

JABURG|WILK
Attorneys at Law

1    107.    Defendants deliberately did not film scenes of Teti throwing a bike part at

2    a show producer.

3    108.    Defendants' intentional and false portrayal that Cody was out of control

4    and that he had to be removed from the show was made to further their goal of

5    portraying the false image that Cody was incompetent, inexperienced, weak, erratic,

6    untrustworthy, overly emotional and mentally impaired in order to serve their own

7    financial interests.

8    109.    At the 40:10 mark of Episode 5, the narrator states that Cody "declined

9    our request to be interviewed for this program."

10    110.    In truth, Cody was never asked to be interviewed about any aspect of

11    Episode 5.

12    111.    Defendants' intentional and false portrayal that Cody had been asked to be

13    interviewed for Episode 5, but declined the offer, was made to further their goal of

14    portraying the false image that Cody was incompetent, inexperienced, weak, erratic,

15    untrustworthy, overly emotional and mentally impaired in order to serve their own

16    financial interests.

17    112.    In the middle of filming the Norway episode, Cody requested a meeting

18    with Nashel and others to get Defendants to deal with Teti's behavior.

19    113.    Cody was fired a week after the Norway episode was filmed.

20    **G.    Defendants acted with actual malice.**

21    114.    Defendants acted with actual malice in defaming Cody.

22    115.    Defendants knew that each of the foregoing statements of fact and implied

23    statements of fact that were made about Cody in Episode 5, whether written, oral or by

24    manipulation and selective editing of the audio and video recordings, were false when

25    made.

26

18639-18639-00001\JXS\JXS\2395096.1

116.    At the very least, Defendants recklessly and consciously disregarded the truth that each of the foregoing statements of fact and implied statements of fact that were made about Cody in Episode 5, whether written, oral or by manipulation and editing of the audio and visual recordings made in the production of the show, were false and defamatory.

117.    Defendants made and/or recklessly and consciously disregarded the truth of each of the false statements and implied statements of fact about Cody because they intended to defame and falsely portray him to the show's viewers as being incompetent, inexperienced, weak, erratic, untrustworthy, overly emotional and mentally impaired in order to serve their own financial interests and so that fans of Dual Survival would continue watching Dual Survival.

118.    Defendants also intended to convey the equally false impression that Teti was very professional and competent because he was continuing on as co-host.

119.    Defendants were warned by Cody's lawyer Tom Kack in his April 14, 2014, letter sent before Episode 5 was aired on the Discovery Channel to refrain from portraying Cody in a false light or defaming him.

120.    Defendants did so anyway.

121.    Upon information and belief, Defendants completely ignored Cody's lawyer's April 14, 2014, letter and failed to conduct a reasonable investigation, or any investigation at all, of the facts or the truth of what was portrayed and said about him in Episode 5 prior to airing the episode.

**H.    Episode 5 was republished many times at different times, to different audiences and through different media since it originally aired.**

122.    Discovery continues to re-publish Episode 5 and make available to different audiences at different times and through different media – including, without

17

1  limitation, through **Discovery Channel**, Amazon, YouTube, ITunes and many other

2  platforms – despite warnings and complaints.

3      123.    **Upon information and belief, since the original broadcast of Episode 5**

4  **and, specifically, on or after May 21, 2015, within one year prior to the date the**

5  **original Complaint was filed, Defendants have repeatedly republished and/or have**

6  **caused, aided and abetted and substantially assisted Discovery to repeatedly**

7  **republish Episode 5 on or through the Discovery Channel in the United States and**

8  **elsewhere throughout the world at different times, to different audiences and for**

9  **commercial gain, without limitation, on or about the following dates: (a) November**

10  **11, 2015, and (c) July 8, 2016.  Discovery is necessary to determine the exact dates**

11  **and the number of dates when Defendants broadcast or caused to be broadcast**

12  **Episode 5 because that information does not appear to be publicly available online.**

13      124.    In particular, but without limitation, upon information and belief,

14  **Defendants have sold or have caused, aided and abetted and substantially assisted**

15  **Discovery to sell** ~~Discovery has sold~~ Episode 5 to Hulu **with the purpose and intent**

16  **that Hulu republish and rebroadcast the episode at different times, to different**

17  **audiences and for commercial gain from such** repeated broadcasts beginning in

18  January 1, 2016**, within one year prior to the date the original Complaint was filed**.

19      125.    Defendants **were at that time,** and are, well aware that Hulu **would and**

20  **would continue to** ~~will~~ repeatedly rebroadcast Episode 5 at different times, to different

21  audiences and through a different medium **for commercial gain**.

22      126.    **Upon information and belief, Hulu first broadcast Episode 5, which it**

23  **purchased from Discovery, on or around January 1, 2016.**

24      127.    **Hulu is an international on-demand online streaming service that has**

25  **said it has approximately 12 million paying subscribers all over the world.**

26

18

128.     **Hulu is owned by The Walt Disney Company, Disney-ABC Television Group, 21st Century Fox, Comcast, (through NBC Universal) and Time Warner (through Turner Broadcasting System.)**

129.     **Beginning on or around January 1, 2016, within one year prior to the date the original Complaint was filed,  subscribers of Hulu could repeatedly watch Episode 5 any time they wished via www.Hulu.com or the Hulu App. and, upon information and belief, hundreds of thousands of them have done so.**

130.     **Recently, on January 1, 2017, Discovery posted a message to its Dual Survival Facebook page encouraging audiences to "binge" watch Seasons 3 through 6 of Dual Survival via Hulu.**

131.     **Episode 5 was, and still is, included in each Season 4 package sold.**

132.     **Also on January 1, 2017, Discovery posted a tweet on Twitter that encouraged audiences to "binge" watch Seasons 3 through 6 of Dual Survival via Hulu.**

133.     **In selling Episode 5, Defendants did so with the purpose and intent that Hulu broadcast Episode 5 at different times, to different audiences and through a different medium for commercial gain in the United States and throughout the world**.

134.     **Upon information and belief, Defendants have sold or have caused, aided and abetted and substantially assisted Discovery to sell Episode 5 to various other broadcasting and publication companies and services (the "Independent Publication Companies") with the purpose and intent that these Independent Publication Companies republish and rebroadcast the episode at different times, to different audiences and through different media for commercial gain in the United States and throughout the world**.

19

JABURG|WILK
Attorneys at Law

135.    **Upon information and belief, the Independent Publication Companies include, but are not limited to, the following:**

- **Xfinity TV (Comcast);**
- **Amazon;**
- **Google Play;**
- **Microsoft;**
- **ITunes;**
- **Sony PlayStation Store;**
- **ShareTV;**
- **Vudu;**
- **DMAX;**
- **Fernsehserien;**
- **www.TV Guide.com;**

136.    **Upon information and belief, since May 21, 2015, within one year prior to the date the original Complaint was filed, the Independent Publication Companies who purchased Episode 5 as listed above have repeatedly published and broadcast Episode 5 to their customers who reside in the United States and countries all over the world.**

137.    **Cody does not know exactly when these Independent Publication Companies have published and broadcast Episode 5, but, upon information and belief, they started doing so on or after May 21, 2015, within one year prior to the date the original Complaint was filed.  Discovery is necessary to determine when these Independent Publication Companies first published and broadcast Episode 5 because that information does not appear to be publicly available online.**

138.    **Upon information and belief, one or more of these Rebroadcasting Companies have dubbed over Episode 5 in numerous languages.**

20

18639-18639-00001\JXS\JXS\2395096.1

JABURG│WILK
Attorneys at Law

139.    **In addition, Discovery Communications currently has 29 network brands in 33 languages.**

140.    **In one or more countries, Discovery Channel programming is made available on digital satellite platforms with multiple language soundtracks or subtitles, including but not limited to, Spanish, German, Russian, Czech, Hindi, Tamil, Telugu, Bengali, Dutch, Portuguese, Italian, Norwegian, Swedish, Danish, Finnish, Turkish, Greek, Polish, Hungarian, Romanian, Arabic, Slovene, Japanese, Korean, Chinese, Thai, Vietnamese, Serbian, and Bulgarian.**

141.    **Discovery Channel claims that it reaches 431 million homes in 170 countries.**

142.    **Upon information and belief, Discovery first broadcast Episode 5 in other countries on or after May 21, 2015, within one year prior to the date the original Complaint was filed.  Discovery is necessary to determine when this first occurred and has since occurred.**

143.    **The voice dubbing into different languages constitutes a modification to Episode 5 that re-triggers the statute of limitations each time it is dubbed.**

144.    **Upon information and belief, Defendants intended these companies to dub over Episode 5 when they sold them Episode 5, and/or they aided and abetted in the dubbing of Episode 5.**

145.    **Upon information and belief, on or after May 21, 2015, within one year prior to the date the original Complaint was filed, Defendants sold Episode 5 to Discovery's branded YouTube channel to be published and broadcast at different times, to different audiences and through this medium for commercial gain on or after May 21, 2015. Discovery is necessary to determine when this occurred and when the broadcasts and publications have occurred.**

18639-18639-00001\JXS\JXS\2395096.1

146.    **Upon information and belief, on or after May 21, 2015, within one year prior to the date the original Complaint was filed, Defendants converted Episode 5 into mini "webisodes" that have since been on the Discovery website, www.DiscoveryChannel.com, to include 1-2 minute "highlights" of Episode 5 which were intended to be broadcast at different times, to different audiences and through this medium for commercial gain.  Discovery is necessary to determine when this occurred and when the broadcasts and publications have occurred.**

147.    **These highlights include some of the defamatory portions of Episode 5 that were and are intentionally designed to make Cody appear incompetent, mentally unstable and erratic.**

148.    **These "webisodes" constitute a modification to Episode 5 that re-triggers the statute of limitations each time it is thus modified.**

149.    **Defendants continue to republish and rebroadcast Episode 5 and/or to cause, aid and abet and/or substantially assist Discovery to republish and rebroadcast Episode 5 on or through the Discovery Channel, Discovery's website and on and through various other media to be broadcast at different times, to different audiences and through other such media for commercial gain.  Discovery is necessary to determine when this occurred and when the broadcasts and publications have occurred.**

I.    **Cody has suffered significant damages.**

150.    After Episode 5 was originally broadcast, and each time the episode has been rebroadcast since then, Cody has suffered and has continued to suffer significant damage to his personal and professional reputation and his business.

151.    Many fans have written to Cody telling him they were disappointed in his behavior and that they had lost respect for him.

JABURG|WILK
Attorneys at Law

152.    Attached as **<u>Exhibit 2</u>**, is, without limitation, just one example of a fan who wrote to Cody stating that he found Episode 5 to be "very disturbing" and that "they made you look like a jerk to use polite language and that if it is accurate, I would not bother being taught by you."

153.    Enrollment at Cody's survival school has continuously and unceasingly been negatively impacted since Episode 5 was released and has been rebroadcast.

154.    Cody's book sales have also continuously and unceasingly been negatively impacted since Episode 5 was released and has been rebroadcast.

155.    Cody has been offered significantly fewer endorsement deals and speaking fees after Episode 5 was released and has been rebroadcast.

156.    Upon information and belief, Cody has also experienced lost opportunities, such as other TV show offers, since Episode 5 was released and has been rebroadcast.

157.    Cody also suffered and continues to suffer severe emotional distress as a direct and proximate result of Defendants' actions.

158.    Cody has trouble sleeping, eating, and concentrating on anything other than what has happened to him.  He feels sick to his stomach whenever he thinks about what Defendants have done to him.  He is continually reminded of what was done to him by fans of the Dual Survival show, and acutely feels the humiliation and brunt of what was done to him, on a daily basis.

### <u>Count One</u>

### (False light)

159.    Cody reiterates each and every above allegation as if set forth in full.

160.    As alleged, Defendants intentionally, or at least recklessly, placed Cody in a false light.

161.   A false light claim and cause of action arises when untrue information has been published about an individual or when true information has been published about an individual that creates a false implication about the individual.

162.   As alleged, Defendants placed Cody in a false light by publishing false information about him and his abilities as a survival skills expert.

163.   As alleged, Defendants published certain statements made by Cody that were manipulated, edited and out of context in order to create the false statement and implication that he is incompetent, inexperienced, weak, erratic, untrustworthy, overly emotional and mentally impaired and, accordingly, that he is not an experienced and competent survival skills expert and instructor.

164.   As alleged, Cody is in truth a highly accomplished survival skills expert and instructor who for the past 27 years has made a living teaching students wilderness survival, primitive living skills and urban preparedness.

165.   Defendants' actions were highly offensive to Cody and, indeed, would be highly offensive to any reasonable person because they deliberately, for personal gain, and falsely portrayed Cody as incompetent, inexperienced, weak, erratic, untrustworthy, overly emotional and mentally impaired and thus jeopardized both his personal and professional reputation and his ability to earn a living.

166.   As alleged, Defendants acted with actual malice in portraying Cody in a false light.

167.   As alleged, Defendants were warned by Cody's lawyer not to portray Cody in a false light or to defame him before Episode 5 first aired.

168.   As alleged, Defendants ignored Cody's clear warnings not to defame him or place him in a false light and have conducted no reasonable investigation of the matter before or after Episode 5 first aired.

24

169.    As alleged, Defendants' actions have impeached and continue to impeach Cody's personal and professional reputation, competency and integrity and have subjected him to ridicule in the eyes of his friends, acquaintances, business associates and the general public worldwide.

170.    Defendants' actions were willful, wanton and malicious and specifically calculated to cause harm to Cody without regard for the consequences of their conduct to Cody – an evil mind guiding an evil hand – and, accordingly, Cody is entitled to an award of punitive damages by reason thereof and requests such an award in an amount to be determined by a jury as sufficient to punish Defendants and to deter others from engaging in such conduct.

171.    As a direct and proximate result, without limitation, Cody has suffered and has continued to suffer severe and suffer significant both presumed and actual damage to his reputation and business, to his books and product sales, to his endorsement deals and speaking fees, and in the lost TV, film, media and literary opportunities and emotional distress he has suffered, all in an amount to be proved at trial.

WHEREFORE, Cody requests that judgment be entered upon Count One against Defendants, and each of them, as follows:

A.    For presumed and actual damages in an amount to be proven at trial;

B.    For punitive damages in an amount determined to be sufficient to punish Defendants for their wrongful conduct and to deter such conduct by Defendants and others in the future;

C.    For his costs of suit ; and

D.    For such other and further relief as is proper and just.

25

18639-18639-00001\JXS\JXS\2395096.1

**Count Two**

**(Defamation)**

172.     Cody reiterates each and every above allegation as if set forth in full.

173.     As alleged, Defendants' statements and implications that were made about Cody in Episode 5, including statements and implications made by way of manipulating and selectively editing the episode, were false.

174.     As alleged, Defendants' statements and implications that were made about Cody in Episode 5, including statements and implications made by way of manipulating and selectively editing the episode, were defamatory per se.

175.     As alleged, Defendants were warned by Cody's lawyer not to portray Cody in a false light or to defame him before Episode 5 first aired.

176.     As alleged, Defendants ignored Cody's clear warnings not to defame him or place him in a false light and have conducted no reasonable investigation of the matter before or after Episode 5 first aired.

177.     As alleged, Defendants acted with actual malice in defaming Cody.

178.     As alleged, Defendants' actions have impeached and continue to impeach Cody's personal and professional reputation, competency and integrity and have subjected him to ridicule in the eyes of his friends, acquaintances, business associates and the general public worldwide.

179.     Defendants' actions were willful, wanton and malicious and specifically calculated to cause harm to Cody without regard for the consequences of their conduct to Cody – an evil mind guiding an evil hand – and, accordingly, Cody is entitled to an award of punitive damages by reason thereof and requests such an award in an amount to be determined by a jury as sufficient to punish Defendants and to deter others from engaging in such conduct.

18639-18639-00001\JXS\JXS\2395096.1

180.    As a direct and proximate result, without limitation, Cody has suffered and has continued to suffer severe and suffer significant both presumed and actual damage to his reputation and business, to his books and product sales, to his endorsement deals and speaking fees, and in the lost opportunities and emotional distress he has suffered, all in an amount to be proved at trial.

WHEREFORE, Cody requests that judgment be entered upon Count Two against Defendants, and each of them, as follows:

A.    For presumed and actual damages in an amount to be proven at trial;

B.    For punitive damages in an amount determined to be sufficient to punish Defendants for their wrongful conduct and to deter such conduct by Defendants and others in the future;

C.    For his costs of suit ; and

D.    For such other and further relief as is proper and just.

### Count Three

### (Declaratory Relief)

181.    Cody reiterates each and every above allegation as if set forth in full.

182.    A controversy has arisen between Cody and Defendants with regard to their respective rights and other legal relations.

183.    Pursuant to 28 U.S.C. §2201, Cody has standing to seek and is entitled to obtain a declaratory judgment to publically state and declare that the statements, whether express or implied, made about him by Defendants in Episode 5, as alleged herein, are false and defamatory.

WHEREFORE, Cody requests that judgment be entered upon Count Three against Defendants, and each of them, as follows:

18639-18639-00001\JXS\JXS\2395096.1

1        A.     For a declaratory judgment declaring that the statements made

2 about him by Defendants in Episode 5, as alleged herein, are false and defamatory;

3        B.     For an award of his taxable costs; and

4        C.     For such other relief the Court deems just and equitable.

6     DATED this 30$^{h}$ day of January, 2017.

7     **Jaburg & Wilk, P.C.**

9     */s/ Kraig J. Marton*

10    Kraig J. Marton
David N. Farren
Jeffrey A. Silence

11    Attorneys for Plaintiff

13    ***Certificate of Service***

14 I hereby certify that on the 30th day of January, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for

15 transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

16 David J. Bodney
Craig C. Hoffman

17 BALLARD SPAHR LLP
1 East Washington Street, Suite 2300

18 Phoenix, AZ 85004-2555
Attorneys for Defendants

21 */s/ Ana M. Canby*

18639-18639-00001\JXS\JXS\2395096.1