WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cody Lundin,<br><br>    Plaintiff,<br><br>v.<br><br>Discovery Communications Incorporated, et al.,<br><br>    Defendants. | No. CV-16-01568-PHX-ROS<br><br>**ORDER** |

Plaintiff Cody Lundin believes the manner in which he was portrayed on an episode of the television show "Dual Survival" was defamatory and depicted him in a false light. Defendants believe Lundin's portrayal on the show was substantially accurate and, even if not, Lundin has no evidence that Defendants knew the allegedly defamatory statements were false or that the statements were published with reckless disregard for their truth. Having watched the episode and reviewed all other evidence proffered by the parties, the Court need not address Defendants' knowledge or intent in crafting the episode. None of the statements identified by Lundin as allegedly supporting his claims are a sufficient basis for his claims.

**BACKGROUND**

The parties have voluminous factual disputes but Lundin's claims are based on the broadcast version of the episode, which the parties have provided. Therefore, the vast majority of the facts necessary for resolving the motion for summary judgment are undisputed. Where appropriate, however, the following describes the facts in the light

most favorable to Lundin.

Lundin is a "world-renowned survival expert" who has been a "professional survival instructor" for close to thirty years. (Doc. 128 at 2; Doc. 135 at 64). In 2009, Discovery Communications, Inc., and Original Media, LLC, approached Lundin to cohost a television show called "Dual Survival." The show aimed to depict survival skills and scenarios with "realism" and "competency." (Doc. 135 at 63). Lundin's expertise fit in with those aims and he agreed to cohost the show. Lundin worked as the show's cohost for approximately three and a half years. (Doc. 135 at 64). During the first two seasons of the show, Lundin's cohost was Dave Canterbury. (Doc. 135 at 65). At the beginning of season three, Canterbury was replaced by Joe Teti.

Consistent with its professed intent to portray realistic survival skills and scenarios, Dual Survival was marketed as an "observational reality show." In truth, however, each episode was "scripted with a story intended to convey a theme or story to its audience." (Doc. 135 at 6). In deciding whether Lundin was falsely and unlawfully portrayed, it is significant that the show more than just occasionally falsely depicted what was actually occurring. For example, the show often portrayed the hosts as having little access to food and water. In reality, the hosts ate breakfast and dinner at "resorts, hotels, [and] game lodges" while lunches were catered on location. (Doc. 135-2 at 272). In addition, one episode depicted Teti tracking and killing an allegedly wild boar. In truth, the show arranged to have a domestic pig tied to vegetation so Teti could easily locate and kill it. (Doc. 135-2 at 274). And another episode depicted Lundin and Teti as unexpectedly coming across a rattlesnake. That rattlesnake, however, was purchased and transported to the filming location in a container. (Doc. 135-2 at 273). The rattlesnake was then placed in an area for Lundin and Teti to "find." Overall, Dual Survival lied "to the show's audience about nearly all aspects of the so-called 'reality' show and the characters on the show." (Doc. 135-2 at 269).

Lundin was happy to participate in the charade as long as he was portrayed in the manner he preferred. Lundin contends the episodes often portrayed conflict between

Lundin and Teti but much of that conflict was scripted. Some of that conflict, however, appears to have been genuine and a few episodes into season four, Defendants Discovery Communications, Original Media, and Executive Producer Brian Nashel ("Defendants") decided to replace Lundin with another individual. Defendants then compiled and aired an episode titled "Journey's End to a New Beginning" depicting Lundin's departure from the show. That episode is the basis of Lundin's claims in this litigation.

The episode touts itself as a "behind the scenes" view of the filming of previous Dual Survivor episodes involving Lundin and Teti. The episode is structured around the fact that either Lundin or Teti would not continue on the show. The episode paints the relationship between Lundin and Teti as involving repeated instances of conflict which, eventually, became unsustainable. Lundin believes the episode viewed as a whole depicts a "False Narrative" of him "walking off the Show in disgrace as a burned-out, irrational, incompetent and mentally ill has-been." (Doc. 128 at 3). Lundin argues the "False Narrative" was "the primary point and purpose of the episode as a whole." (Doc. 128 at 6). After the show was aired, Lundin filed the present suit alleging the episode constituted defamation and false light invasion of privacy because of the "False Narrative" it presented of him.

According to Lundin, the episode must be viewed in its entirety to appreciate the "False Narrative" and the myriad ways in which he was harmed. While the Court has viewed the entire episode, any analysis of its contents requires consideration of discrete portions. *See Rinsley v. Brandt*, 700 F.2d 1304, 1310 (10th Cir. 1983) (holding plaintiff must "identify particular false statements" to allow for analysis). During discovery, Lundin provided a twenty-page list of all the "defamatory and false or implied statements" in the episode that supported his claims. (Doc. 135-2 at 269). Lundin appears to have retreated from that list, possibly because he realized many of the statements he originally listed cannot be deemed actionable by Lundin.[1] Lundin's current

---

[1] For example, the episode states Teti had been a soldier for twenty years. Lundin cites that "false exaggeration of [Teti's] military experience" as defamatory. Lundin does not explain how exaggerating Teti's military experience brought Lundin into disrepute, impeached his honesty, or in any way affected his reputation. *See Godbehere v. Phoenix*

briefing has focused on eight portions of the episode. The Court will describe and analyze those eight portions as well as a few portions of the episode that painted Lundin in a positive light and Teti in a negative light.

### 1. Spear and Lighter Throwing Incident

During the portion of the episode showing events in Hawaii, Teti is shown standing in a pool of water while Lundin is standing a few feet above him. The episode's narrator sets the scene by stating: "Joe and Cody are attempting to get their only resources, a hunting spear, a gourd full of water, and a lighter wrapped in a bandana down to lower ground in a controlled manner." (Doc. 117-2 at 92). Lundin is then depicted as holding the lighter and stating "This needs to remain dry, this needs to remain dry so I'm going to wrap this up . . . " to which Teti replies "Okay." The narrator then states "But as you'll see, something causes Cody to begin tossing [the items] haphazardly to Joe, causing tempers to flare for both men." After Teti repeatedly tells Lundin to throw the items down to him, Lundin is shown throwing everything into the water, making no effort to allow Teti to catch the items. Lundin states "How about that? You can make fire with wet [BEEP]. How about if I [BEEP?] That [BEEP] work?"

Immediately after Lundin's outburst, the episode shows Nashel commenting: "I don't know and nobody really knows exactly what happened, if there was an incident that set them off, it definitely got a little hairy and we definitely saw the tension between Joe and Cody really come to a head during that episode." Teti is then shown commenting: "I don't [BEEP] know what just happened. I—I—I don't know, is he freaking dehydrated or just like had a complete brain fart. I don't know. It's unacceptable. That kind of behavior, where I came from, he'd be [BEEP] history." (Doc. 117-2 at 95).

After depicting Lundin throwing the items, Lundin is depicted as stating,

> I lost my cool. They're not going to run that or I'll quit. They need to pick that up somehow or cancel it off or stay the [BEEP] out of my way with what I want to do with my career for now. I'm not jeopardizing that. They can run it and they can face the consequences, it's that simple. You tell

*Newspapers, Inc.*, 783 P.2d 781, 787 (Ariz. 1989) (establishing elements for defamation claim).

- 4 -

> Brian or I'll—I'll tell him myself, but don't have him waste a whole bunch
> of time with that scene. I—I don't care at this point. I'm just fried man.
> I'm fried.

Lundin describes this scene as a "cornerstone piece of the False Narrative that makes Cody look grossly incompetent in his life-long profession and mentally ill for no explained or apparent reason." Lundin claims the "truth" is that he had resisted throwing the items down to Teti but a producer "coerced and forced Cody to throw the lighter into the water." (Doc. 135 at 27). But Lundin admits, as reflected by his own statement shown during the episode, he was angry at the time he threw the items into the pool. However, Lundin believes it was defamatory for the episode to depict him as angry at Teti when, in truth, he was "angry at [the producer] for making him" throw the items. In addition, Lundin believes everyone knew he was upset at the producer, not Teti. Thus, the statements by Teti and Nashel that they did not know exactly why Lundin was upset were false and generated a misleading picture of Lundin.

### 2. Cooling Off Scene

Shortly after the spear and lighter throwing incident, the episode depicts Nashel as stating "From a production standpoint it was a pretty scary time. The production was down for two days while the guys cooled off and while the producers figured out how to work around this incident." (Doc. 117-2 at 96). Lundin claims Nashel's statement was false and misleading in two respects. First, Lundin states production was not down for "two days." Instead, the production was down only for the afternoon and evening of one day and the following morning. And second, Lundin believes it was Teti's "violent threats and mentally unbalanced behavior" that caused the delay, not a requirement that both Lundin and Teti "cool[] off." (Doc. 128 at 10). Apparently Lundin believes it was defamatory and portrayed him in a false light for Nashel to exaggerate the length of the break in filming and to not explicitly blame Teti for the break. Lundin contends Nashel's statement led viewers to conclude Lundin had mental troubles and those mental troubles were causing the difficulties.

### 3. Lundin Portrayed as Looking for Rubies

During the portion of the episode depicting events in Sri Lanka, the narrator states "As the production continued, distractions during filming slowed down the shoot." Lundin is then shown, standing in a pool of water and looking down into the water. Lundin's voice is then heard to state "I'm [BEEP] looking for rubies. [BEEP] this [BEEP] show. I'm going to look for rubies." A crew member is then heard saying "Okay, guys, uh, you ready, Joe?" And Teti responds "Yes, sir." (Doc. 117-2 at 99).

Lundin states this scene "accurately depicts some of what was filmed" but "the edited pieces were deliberately manipulated to falsely portray what had actually happened." (Doc. 128 at 7). Lundin has presented two slightly different explanations of this scene. During his deposition, Lundin was asked about the scene:

> Question: Did – did – did you stop and ever look at rubies?
>
> Lundin: It was a joke, but in Sri Lanka there are supposed to be – I think part of the narrative said –
>
> Question: Let me understand this. So in one scene, you laugh and laugh and laugh continuously while your co-host is trying to kill a poisonous rattlesnake and people on the crew don't really know what is up with you, and now you are looking at rubies but that is a joke?
>
> Lundin: You are taking this out of context.
>
> Question: I am trying to understand the context, sir.
>
> Lundin: Well, the problem – you would understand it if there had been an episode that was based on truth. You are scrambled because you have been scrambled by – by media voodoo.
>
> Question: Excuse me, I – I don't believe I have been scrambled by media voodoo. I am trying to understand your reality here, sir, and -- and I think you said you were -- you said this line -- isn't this a true statement, "I am -- beep -- looking for rubies"? Did you ever say that --
>
> Lundin: I am sure I did.
>
> Question: -- in Sri Lanka? It is a true statement?
>
> Lundin: Probably did, yes.

(Doc. 117-1 at 72-73). In other words, during his deposition Lundin admitted the episode accurately depicted him making the statement that he was "searching for rubies" but the statement was meant as a joke. Lundin now seems to offer a slightly different version of events in opposing the motion for summary judgment.

In an affidavit he submitted in connection with his summary judgment opposition, Lundin concedes he made the "looking for rubies" statement but argues "[t]he actual context of the unused scene [in Sri Lanka] was a private conversation concerning my finances, not my irrational and mentally unbalanced search for rubies." (Doc. 135-1 at 38). Thus, Lundin's affidavit appears to be claiming the scene was misleading in that the additional context regarding his personal finances was not included.

Regardless of which explanation of the scene is entirely accurate, Lundin believes it was inappropriate for Defendants to depict him making a statement he actually made without the explanation he proposes. Lundin believes that depiction made him look mentally ill although Lundin does not provide any clear explanation why viewers would reach such a conclusion.

**4. Laughing at Rattlesnake**

During a scene filmed in New Mexico, Lundin and Teti are shown coming across a rattlesnake. Teti decides to kill the rattlesnake and attempts to do so. In response, Lundin is depicted as laughing for an extended period of time. Teti is shown commenting "Cody's laughing. I'm like, what are you laughing at? This is not funny. This is a deadly venomous snake." And a crew member is shown commenting "I'd always tell myself that Cody has a laughing problem. I think this is one of those moments where no one was really sure what he's laughing at. Maybe not even him." (Doc. 117-2 at 79). The narrator explains "Although Cody's laughter was included in the episode that aired, what viewers didn't see is that it went on for some time longer, leaving the crew frustrated and unsure what to shoot, as this outtake illustrates." Lundin is then depicted as laughing for an extended period of time.

Lundin argues the laughing scene was "a particularly unsettling piece of the False

Narrative that, perhaps more than others, unmistakably portrays him as an incompetent and seriously mentally ill basket case." (Doc. 128 at 8). Lundin has not explained what was false or misleading about the depiction of his laughter, which did occur. Instead, in his affidavit he states he "genuinely thought Joe Teti's incompetence with the rattlesnake . . . was very funny." (Doc. 135-1 at 32).

### 5. Focused on Teti's Sunglasses

Leading up to a scene filmed in Oman, Nashel is shown commenting that Lundin "was really focusing on things that had nothing to do with the show, like the kind of sunglasses Joe was wearing, and it was really distracting to him that Joe was wearing a certain brand of sunglasses and Cody was really having trouble staying focused on the mission at hand." The episode then shows Lundin and Teti in Oman. The narrator describes the footage as showing "Cody completely distracted by Joe's sunglasses and unable to continue their discussions about tactics for rescue." Lundin is shown stating to Teti: "I see those [BEEP] sunglasses." Joe states "Here, I'll just take them off." Someone off camera then states "Now we have an idea that you guys are going to continue down the -- the wadi. Would that be a fair assessment?" And Lundin states "My head's just not in the game, guys. You know. I need to take a break because I'm all jumbled up now. I can't concentrate." (Doc. 117-2 at 101).

Lundin explains that this scene was false or misleading in that it did not provide the larger context for his comment regarding Teti's sunglasses. According to Lundin, Teti had a contract prohibiting him from "wearing and endorsing brand-name apparel on air." Teti's sunglasses had a brand name on them and the "actual context" of Lundin commenting about Tetit's sunglasses was merely "Cody pointing out Teti's defiant breach of his contract, not Cody's seemingly irrational and mentally ill meltdown over a pair of sunglasses." (Doc. 128 at 9). According to Lundin, the failure to include that additional context resulted in the episode depicting him as mentally ill.

### 6. Boiling Point

Towards the end of the episode, there are a number of scenes filmed in Norway.

- 8 -

The narrator introduces those scenes by stating "the final blow between Cody and Joe would take place during the fourth episode of season four, on a barren mountain top in the Norwegian Highlands while looking for shelter against subzero temperatures and 50 mile per hour winds." (Doc. 117-2 at 101). Nashel is then shown commenting "Tensions had built so much at that point that by the time we got to Norway things had reached a boiling point." Lundin claims these statements were false or misleading in that they implied the filming in Norway occurred shortly after the filming in Hawaii. In fact, the Hawaii filming had occurred "nearly two years" earlier. (Doc. 128 at 11). The statements were also allegedly misleading in that they "falsely blamed Cody, or more specifically his mental and emotional illness, for problems that were caused by Teti."

During the Norway section Lundin and Teti are also shown as having repeated disagreements. One such disagreement involved looking for shelter and Lundin's choice to wear shorts and socks instead of winter clothing.

> Teti: If you don't find shelter down there what are you going to do? What are you going to do?
>
> Lundin: I'm going to keep moving.
>
> Teti: You teach your students to walk around in shorts and socks? My life is being compromised.
>
> Lundin: [BEEP] you, Joe.

Lundin claims this scene was false or misleading because he did not say "[BEEP] you, Joe" at that exact time. Lundin admits he said that phrase but he denies saying it at the exact time he is depicted as saying it.

### 7. End of Norway Scene

At the end of the Norway footage, Cody is depicted as saying "[BEEP] you, Nashel." Immediately following that, Nashel is shown as stating "Those are the kinds of things that we had to look at and take into account and say how do we continue doing the show with this relationship that clearly isn't working anymore?" Lundin believes those statements were false or misleading in that he did not utter "[BEEP] you, Nashel" at the

- 9 -

time depicted. Lundin admits he said the phrase but disputes saying it at that exact time. In addition, Lundin believes Nashel's comment was false or misleading because it allegedly established Lundin's "descent into mental illness" prompted his departure from the show. Nashel made no reference to mental illness. Lundin has not explained why a viewer would conclude Nashel's statement that they had to "look at and take into account" Lundin's behavior implied Lundin was suffering from a mental illness and that the comment indicated only Lundin was at fault.

### 8. Requests to Comment

Immediately prior to showing the footage from Norway, the episode displays text stating "Cody and Joe both declined our request to comment on the following incident from Norway." And after the Norway footage, the narrator states "Norway would be Cody's last episode of Dual Survival. He declined our request to be interviewed for this program." (Doc. 117-2 at 104). Lundin argues these statements were false or misleading because he was "never asked to unconditionally comment or be interviewed." (Doc. 128 at 11). The presence of "unconditionally" is vital to Lundin's argument because Lundin concedes he was asked to comment, subject to review by Defendants. It is not clear why Lundin believes reporting his refusal to offer comments on the episode reflected negatively on him.

### 9. Favorable Depictions and Depictions of Teti

In addition to the eight portions of the episode on which Lundin bases his claims, a few portions of the episode paint Lundin in a favorable light. For example, the episode's narrator states "whatever the scenario . . . sooner or later survival usually hinges on one's ability to start a fire. . . . And there may be no one on the planet who has mastered the art of primitive fire like Cody Lundin." (Doc. 117-2 at 73). The show then depicts Lundin successfully making fire using primitive techniques. Also, at the end of the show, Nashel is shown stating "Losing Cody is a big blow to the show. He is an incredibly personality, he has amazing survival skills and he's taught a lot of people a lot of stuff. So when you're replacing a guy like Cody Lundin you have to be absolutely certain that you found

- 10 -

somebody whose primitive skills are on par with or better than Cody Lundin's." (Doc. 117-2 at 104).

In addition to containing positive statements regarding Lundin, the episode also contains numerous negative depictions of Teti. For example, the episode depicts Teti as bumbling through his attempts to kill the rattlesnake. There is no explanation why Teti had such a difficult time given his alleged prowess as a hunter and survivalist. The episode also depicts Teti and Lundin coming across a dead and rotting cow. Teti decides to take the time to skin the cow. There is no explanation why Teti believed doing so would be a good idea and it is portrayed as a foolish and abnormal endeavor. Finally, Teti is shown drinking his own urine but not because of dehydration. Instead, Teti states "I'm going to take a mouthful [of urine], but just to give me a little psychological edge." (Doc. 117-2 at 70). Teti does not explain what "psychological edge" would be derived from drinking his own urine and the scene depicts him as simply having a bizarre desire to drink urine. In that scene, Lundin was depicted as questioning or challenging Teti's behavior. Overall, the episode contains a variety of scenes where Lundin is depicted as the more reasonable individual. The positive depictions of Lundin and the negative depictions of Teti conflict with Lundin's argument that the entire episode was meant to paint him as incompetent and suffering from a mental illness.

## ANALYSIS

Lundin's two claims are Arizona-law claims for defamation and false light invasion of privacy. These clams are subject to demanding constitutional limits. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) ("The First Amendment limits California's libel law in various respects."). In this case, however, the Court need not explore the constitutional aspects because the basic requirements of Arizona law dictate the outcome.

Under Arizona law, a claim for defamation requires evidence "(1) that the defendant made a false statement; (2) that the statement was published or communicated to someone other than plaintiff; and (3) that the statement tends to harm plaintiff's

reputation." *Donahoe v. Arpaio*, 869 F. Supp. 2d 1020, 1061 (D. Ariz. 2012). The requirement of a "false statement" means the statement must have been an "assertion of objective fact." *Yetman v. English*, 811 P.2d 323, 328 (Ariz. 1991). Further, the statement must be "susceptible of being proved true or false." *Pinal Cty. v. Cooper ex rel. Cty. of Maricopa*, 360 P.3d 142, 147 (Ariz. Ct. App. 2015). Statements involving "political invective, opinion, or hyperbole" cannot be the basis for a defamation claim. *Burns v. Davis*, 993 P.2d 1119, 1129 (Ariz. Ct. App. 1999). And even assertions of objective facts that are false are not actionable provided they are "substantially true." *Read v. Phoenix Newspapers, Inc.*, 819 P.2d 939, 941 (Ariz. 1991). Arizona courts have interpreted this "substantial truth" requirement in a relatively broad fashion.

A statement is substantially true, and therefore not actionable, "as long as the 'gist' or 'sting' of the publication is justified." *Id.* In other words, "a technically false statement may nonetheless be considered substantially true if, viewed through the eyes of the average reader, the statement differs from the truth only in insignificant details." *Desert Palm Surgical Group, P.L.C. v. Petta*, 343 P.3d 438, 449 (Ariz. Ct. App. 2015). The "substantial truth" inquiry focuses on the harm to the plaintiff's reputation by the inaccurate statement versus the harm to the plaintiff's reputation if the statement had been entirely factually accurate. For example, an article describing an individual as "doing four-to-five years in prison" was substantially true despite that individual being out on bail pending appeal at the time of the article's publication. *Fendler v. Phoenix Newspapers Inc.*, 636 P.2d 1257, 1259 (Ariz. Ct. App. 1981). In that case, the "sting" of the article was deemed the same whether the individual was actually in prison or had merely received such a sentence and was awaiting the outcome of an appeal. *Id.* Similarly, a newspaper's inaccurate description of the crime an individual had been convicted of was not actionable because the inaccuracy did not cause the individual "any more damage" than what would have resulted had the article been completely accurate. *Read v. Phoenix Newspapers, Inc.*, 819 P.2d 939, 942 (Ariz. 1991).

The substantial truth doctrine applies only to Lundin's defamation claim but his

- 12 -

false light claim has a very similar requirement. Under Arizona law, false light liability requires evidence Defendants made true or false statements that placed Lundin in a false light that was "highly offensive to a reasonable person." *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 786 (Ariz. 1989). But similar to the "substantial truth" doctrine, a false light claim depends on "a major misrepresentation of [the plaintiff's] character, history, activities or beliefs, not merely minor or unimportant inaccuracies." *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 787 (Ariz. 1989).

Application of the "substantial truth" and "major misrepresentation" doctrines require consideration of the entire episode. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 515 (1991) (noting "an exact quotation out of context can distort meaning, although the speaker did use each reported word"). But it is impossible to analyze the episode as an undifferentiated single statement. Therefore, the Court will analyze the eight portions outlined above, keeping in mind the need to view those portions in the larger context.

Before looking at those eight portions, it is important to point out that, prior to this case, the Court had no knowledge of Dual Survival, Lundin, or Teti. The Court had not seen an episode of Dual Survival nor heard of Lundin or Teti. Even now, the only information the Court has considered is that filed by the parties. Those filings do not include information on how Lundin was portrayed in other episodes. Based on his filings, it seems Lundin was pleased with his previous portrayals and his portrayal in the relevant episode was a sudden and drastic change. The Court has no way of knowing whether that is accurate. Given the information provided by the parties, the Court's analysis will focus exclusively on whether the depiction of Lundin in the relevant episode supports either of his claims.

### 1. Spear and Lighter Throwing Incident

Viewed in the light most favorable to Lundin, this scene involved a number of minor inaccuracies. Those technical inaccuracies, however, do not materially alter the "sting" or "gist" of the scene. It is undisputed Lundin became angry and started throwing

- 13 -

things in the water instead of throwing them down for Teti to catch. Whether Lundin was angry with a producer rather than Tetit does not alter the fact that Lundin had an emotional outburst or, in Lundin's own words, "lost [his] cool." Assuming the depiction of Lundin's outburst somehow harmed his reputation, there would have been no less damage to Lundin's reputation if the episode had disclosed the precise cause of Lundin's outburst. *Read*, 819 P.2d at 942 (accurate article would not have caused "any less damage to Read's reputation"). Moreover, the fact that Nashel and Teti professed ignorance (which may have been true) about the cause of Lundin's behavior did not materially impact the "sting" of the scene. Whether angry at a producer or Teti, any harm to Lundin was the same. Therefore, the scene was substantially true and cannot serve as the basis for a defamation claim.

As for the false light aspect of this scene, depicting Lundin throwing the lighter and spear into the water did not present any "major misrepresentation" of Lundin's character. The scene accurately depicted Lundin's anger and actions. Failing to disclose Lundin's behavior was due to a producer, and not Teti, did not constitute a major misrepresentation of Lundin's "character, history, activities or beliefs." *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 787 (Ariz. 1989). Thus, this scene cannot support his false light claim.

### 2. Cooling Off Scene

The statement by Nashel that "production was down for two days while the guys cooled off" was substantially true. Whether production was down for two days or a slightly shorter period of time does not materially impact the "gist" or "sting" of the statement. If the episode had accurately stated "production was down for a while" instead of "production was down for two days," a viewer still would have understood a cooling-off period was necessary. Moreover, the statement that time was needed while "the guys cooled off" was not defamatory. It is undisputed that Lundin had an emotional outburst and while Teti might have also contributed to the break in filming, Nashel's professed opinion that production was down while both Lundin and Teti "cooled off" is

1 not actionable. *See Burns v. Davis*, 993 P.2d 1119, 1129 (Ariz. Ct. App. 1999) (statements of opinion are not actionable). Therefore, the statement regarding a break for cooling off does not support Lundin's defamation claim.

As for the false light aspect of this scene, exaggerating the length of delay and the vague statement that there was delay while "the guys cooled off" did not constitute a major misrepresentation of Lundin's character or behavior.

### 3. Lundin Portrayed as Looking for Rubies

Lundin made the "looking for rubies" statement but the episode did not present the full context of that either being a joke or made only in the context of his personal finances. The absence of additional context, however, did not render the depiction of Lundin "false" in any meaningful way. That is, Lundin admits he made the statement and Defendants had no obligation to present the context Lundin would have preferred. *See, e.g.*, *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1108 (10th Cir. 2017) ("The omission of additional favorable information from an otherwise true publication does not render a statement materially false."). Statements taken completely out of context might be able to support a defamation claim in certain situations. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 515 (1991) (noting "an exact quotation out of context can distort meaning, although the speaker did use each reported word"). But the context must be sufficiently distinct such that the "gist" or "sting" of the statement is clearly different. Here, the statement was presented in the context of waiting to begin shooting additional scenes while Lundin apparently believes the statement was made while waiting to begin shooting and he was joking or discussing his finances. The slight differences between those two contexts did not meaningfully distort what Lundin said. The "looking for rubies" statement, therefore, is not a sufficient basis for a defamation claim.

As for false light, depicting the "looking for rubies" statement did not constitute any "major misrepresentation" of Lundin's character or behavior. In fact, it was an accurate depiction of Lundin's behavior and statement. Thus, this scene is not a

- 15 -

sufficient basis for a false light claim.

### 4. Laughing at Rattlesnake

The scene involving the rattlesnake and Lundin's laughter was factually accurate. Lundin has not identified any aspects of the scene that were false and Lundin has not explained how accurate representations of actions he took (*i.e.*, laughing for an extended period of time) can possibly support his defamation and false light claims. Therefore, this scene is not a viable basis for his claims.

### 5. Focused on Teti's Sunglasses

As with the rattlesnake scene, there was nothing false about the sunglasses scene. The scene accurately depicts Lundin making a statement about Teti's sunglasses and Lundin then stating he needs time to think. To the extent Lundin believes Defendants should have included a general explanation for why Lundin was concerned about the brand of sunglasses Teti was wearing, Defendants had no legal obligation to provide that additional context. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1108 (10th Cir. 2017). Given that the scene was factually accurate, it cannot serve as a basis for either of Lundin's claims.

### 6. Boiling Point

Lundin points to a variety of ways the scenes from Norway were defamatory, such as the description by Nashel that the relationship between Lundin and Teti had reached a "boiling point," the failure to explain how long of a gap there was between filming in Hawaii and in Norway, the suggestion that his behavior was due to a mental illness, and the depiction of him making a statement he did not make. None of these arguments have merit.

First, it was not false or misleading for Nashel to state the relationship between Lundin and Teti had reached a "boiling point." Describing it as having reached a "boiling point" was not a statement capable of being proven true or false. *See Burns v. Davis*, 993 P.2d 1119, 1129 (Ariz. Ct. App. 1999) (noting "political invective, opinion, or hyperbole" cannot support defamation claim).

Second, Lundin apparently believes it was defamatory for the episode to invite viewers to conclude that the events in Hawaii and Norway occurred close in time. While the episode placed the scenes in Hawaii and Norway close together, the episode clearly identified the scenes in Hawaii as occurring during Season 3 while the scenes in Norway were filmed during Season 4. Accordingly, viewers could not have concluded the events in Norway followed immediately after Hawaii. And even if a viewer did conclude the Norway scenes occurred immediately after Hawaii, Lundin offers no explanation how it was defamatory to portray the scenes as occurring close in time.

Third, Lundin argues the scenes in Norway show him as suffering from a mental illness. There is nothing in the statements or visual depictions identifying Lundin as having a mental illness or even implying some mental illness was contributing to the events. The Court cannot find defamation based on references that do not exist.

Finally, on the subject of Lundin's alleged statement "[BEEP] you, Joe," it is undisputed that Lundin routinely used profanity while filming episodes. Therefore, it is undisputed the phrase was not completely fabricated. Instead, viewing the evidence in the light most favorable to Lundin, the phrase was recorded at a different time and then inserted at the end of the confrontation between Lundin and Teti. Lundin offers no explanation how the "gist" or "sting" of this statement was different because Defendants inserted it into a time where Lundin did not utter it. There is no indication that taking a statement Lundin made at a different time and inserting it at a moment in the episode where such a comment made sense and was consistent with Lundin's usual behavior, would cause any viewer to think less favorably of Lundin. *See Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1107 (10th Cir. 2017) (a statement is defamatory only if it is "likely to cause reasonable people to think significantly less favorably about the plaintiff than they would if they knew the truth").

As for the alleged false light aspects of these scenes, there were no major misrepresentations of Lundin's character or behavior. The scenes used language ("boiling point") that is not provably false, accurately identified when the Hawaii and

- 17 -

Norway filming occurred, contained no references to mental illness, and used Lundin's own words in a different setting that was consistent with how Lundin spoke and reacted in similar situations. The scenes do not support the false light claim.

### 7. End of Norway Scene

The end of the Norway scene depicted Lundin stating "[BEEP] you, Nashel" and then Nashel stating "Those are the kinds of things that we had to look at and take into account and say how do we continue doing the show with this relationship that clearly isn't working anymore?" Lundin believes it was defamatory or depicted him in a false light to edit the scene so it appeared he said "[BEEP] you, Nashel" at that time. Lundin admits he said "[BEEP] you, Nashel" at some point in time but Lundin disputes saying it at that exact time. As addressed above, Lundin routinely used profanity, including profanity aimed at individuals. Lundin has not established that depicting him as making this statement in this particular context qualified as harmful in light of the many other instances when he used profanity. And given Lundin's constant use of profanity, using his own words in a different setting did not constitute a major misrepresentation of his character sufficient to support a false light claim.

### 8. Requests to Comment

The statements at the end of the episode that Lundin declined Defendants' requests to comment or be interviewed were substantially true. Defendants gave Lundin an opportunity to comment or be interviewed, although he was not allowed to comment "unconditionally." Reporting that Lundin refused to comment "unconditionally" would have had the same "gist" or sting" as the actual statements that imply Lundin refused to comment. Therefore, these statements are not actionable. And finally, stating that Lundin refused to comment did not constitute a major misrepresentation of any aspect of Lundin's character.

### 9. Conclusion

Some of the scenes identified by Lundin as the basis for his claims were completely factually accurate while others were only substantially true. Whether viewed

in isolation or in the full context of the entire episode, none of the scenes are a sufficient basis for Lundin's defamation and false light claims. At times, the episode depicted Lundin as a rational and careful individual with high quality survival skills. It is a reasonable inference to conclude that Teti, on the other hand, was often depicted as foolish and inept. Lundin's belief that the episode created a "False Narrative" of him as burned out and mentally ill has no basis in the actual contents of the episode. Whether viewed as discrete scenes or as a whole, the episode simply does not contain any actionable statements. Defendants are entitled to summary judgment in their favor.[2]

Accordingly,

**IT IS ORDERED** the Motion for Summary Judgment (Doc. 116) is **GRANTED**. The Clerk of Court is directed to enter judgment in favor of Defendants.

**IT IS FURTHER ORDERED** the Motion to Preserve Privilege (Doc. 105) and Motion for Extension of Time (Doc. 107) are **DENIED AS MOOT**.

Dated this 2nd day of November, 2018.

Honorable Roslyn O. Silver
Senior United States District Judge

---

[2] There are two pending motions related to discovery issues. The resolution of the summary judgment motion renders both motions moot. The first motion involves a discovery dispute regarding Defendants' redaction or withholding of certain documents. Defendants had asserted those documents were privileged while Lundin disagreed. Defendants filed a motion requesting the Court rule that they need not produce the documents. There is no need to resolve this issue as the withheld documents would not impact the analysis of the episode's contents. That is, the documents would not change the nature of the statements made in the episode. Even assuming the documents would further establish Lundin's beliefs regarding Defendants' motivations in creating the episode, those motivations do not change the fact that the statements in the episode were either factually true, substantially true, or not capable of being proven true or false. Therefore, Defendants will not be required to produce additional documents.

The second discovery-related motion involves Lundin's request for an extension of time for him to serve a supplemental expert report regarding damages. Again, the statements made in the episode speak for themselves and establish Lundin's claims fail as a matter of law. Therefore, there is no need to address Lundin's request for additional time to produce evidence related solely to damages.